IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AYISHA ELLIOTT (BROWN), and
QUINTON RICHARDSON-BROWN
        Plaintiffs,　　　　　　　　　　　　　Case. No. 6:16-cv-00022-MC

    v.　　　　　　　　　　　　　　　　　OPINION AND ORDER

CITY OF EUGENE, OFFICER TREVOR
HART, SERGEANT WILLIAM
SOLESBEE, OFFICER MATHEW
STROPKO, and OFFICER CLIFFORD
SITES,

        Defendants.
_____

MCSHANE, Judge:

Plaintiffs Ayisha Elliott and Quinton Richardson-Brown bring this 42 U.S.C. § 1983 action against the City of Eugene and various officers of the Eugene Police Department. Their claims include excessive force, false arrest, illegal search and seizure, battery, negligence, and race discrimination. Additionally, Plaintiffs bring *Monell* and negligence claims against the city. Defendants move for summary judgment on multiple claims, but concede that that there are factual issues in dispute as to the claims of excessive force, battery, and negligence. Defendant's motion for partial summary judgment is GRANTED in part.

1—OPINION AND ORDER

## BACKGROUND

At approximately 2:43 a.m on the morning of July 16, 2015, Ayisha Elliot called 911 because she was concerned about her son's behavior. Miller Decl. Ex. 1 at 2, ECF No. 33. During this phone call Ms. Elliott expressed that her son was having a psychotic break and that he was behaving aggressively. Miller Decl. Ex. 1 at 3. Her son, Quinton Richardson-Brown, was not able to understand who he was talking to or where he was. Elliott Dep. 88, ECF No. 33-6. Even though Ms. Elliott stated on the phone that she did not think she was in danger, Mr. Richardson-Brown could be heard angrily cursing at Ms. Elliott throughout the phone call. Miller Decl. Ex. 1 at 3-8. At 3:36 A.M., 911 received a second call from Ms. Elliot's ex-husband. He indicated that Ms. Elliot was in danger. Specifically, he reported:

> And um, it sounded like he was trying to choke her out. That's why I'm calling you guys. He was—she kept—she was screaming and yelling and saying, "Let go of me. Let go of me." And he's like, "No, you're not my mother. You're not my mother." And then they hung up the phone and she was screaming. She was like, "I can't breathe. I can't breathe." (Unintelligible) and then the phone hung up and I've been trying to call back and I can't get through. So I don't know. This—it sounds like it might have got dangerous.

Miller Decl. Ex. 2 at 4, ECF No. 33.

The Eugene Police Department dispatched Officers Mathew Stropko and Clifford Sites. The officers arrived at the home within approximately ten minutes and knocked on the door. Ms. Elliott answered the door and stepped onto the porch, explaining to the officers her son's history and current psychotic difficulties. At this point, the conversation remained calm and explanatory.

Mr. Richardson-Brown then came to the doorway. Officer Sites remained closest to Mr. Richardson-Brown during this encounter, while Officer Stropko provided backup from a few feet away. Elliott Dep. 103. The situation deteriorated rapidly when one of the officers requested that the porch light be turned off. This occurred approximately 7 minutes into the encounter. Miller Decl. Ex. 4 at 4. After this request, Mr. Richardson-Brown became quite agitated and began

cursing at the officers and at his mother. See Miller Decl. Ex. 4 at 4-19. As the situation became more heated, Officer Sites told Mr. Richardson-Brown he was "trying to help him." Miller Decl. Ex. 4 at 6. Mr. Richardson-Brown responded with "you're lyin' to my fuckin' face." Miller Decl. Ex. 4 at 6. From here, Mr. Richardson-Brown became more agitated, repeatedly cursed at the officers, and asserted his belief that the officers were not in fact police officers. Miller Decl. Ex. 4 at 6-8.

With the encounter now quite heated, Officer Stropko repeatedly ordered Mr. Richardson-Brown to get back. He warned Mr. Richardson-Brown that he had a taser. Miller Decl. Ex. 4 at 4; Elliott Dep. 104. During this time, Ms. Elliott began shielding her son from the officers, ignoring Officer Stropko's order to get away from Mr. Richardson-Brown. Elliott Dep. 108. Mr. Richardson-Brown's uncle then arrived on the scene.

While the situation deteriorated, Ms. Elliott ordered the officers to remove themselves from her property. Miller Decl. Ex. 4 at 16. Elliott Dep. 107-108. 120-122. Officer Hart and Sergeant Solesbee then arrived on the scene. Miller Decl. Ex. 4 at 22; Elliott Dep. 123-124.

At some point—the record is not entirely clear—Officer Sites handcuffed, or began to handcuff, Mr. Richardson-Brown. It is undisputed that Officer Stropko deployed his taser, and that it either missed Mr. Richardson-Brown or was ineffective. Officer Stropko then punched Mr. Richardson-Brown in the face. The parties disagree on whether Mr. Richardson-Brown was handcuffed when Officer Stropko punched him. The parties also disagree on whether Mr. Richardson-Brown charged Officer Stropko immediately before Officer Stropko deployed his taser.

The record is also unclear as to where Ms. Elliot was during the deployment of force against her son. At some point she was forcibly removed from the porch by Officer Hart and

Sergeant Solesbee and detained. Officer Stropko and Officer Sites detained Mr. Richardson-Brown. Elliott Dep. 127-129; Miller Decl. Ex. 4 at 22-23.

## STANDARD OF REVIEW

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

1. **Monell Claim**

Plaintiffs essentially allege two theories of liability under *Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658 (1978).[1] First, plaintiffs claim that the City has express customs or policies that allow for the use of excessive force. Second, that the City has passively encouraged the use of excessive force by failing to train, supervise, or discipline officers. I address each theory in turn.

---

[1] Plaintiffs agreed to dismiss the theory of liability revolving around the city having a pattern or practice of excessive force claims. Pl.'s Resp. 8.

As to the City having express customs or policies allowing for the use of excessive force, this theory of liability fails. *Monell* established that a municipality can be held liable under 42 U.S.C. § 1983 for injuries sustained as a result of a municipal custom or policy. *Id.* at 694. A municipal custom or policy does not have to "receive[] formal approval through a [municipality's] official decision-making channels." *Id.* at 691. However, a municipality cannot be held liable solely for the actions of its employees or agents. *Id.* at 694. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* Thus, there must be a causal link between the alleged unconstitutional action and the policy or custom of the municipality. *Id.*

Plaintiffs have presented no evidence indicating that the City has a custom or policy allowing for the use of excessive force. Defendants provided evidence stating the City in fact has a policy of "train[ing] officers to use only the force that reasonably appears necessary . . . to effectively gain control of the incident." Kerns Decl. 2, ECF No. 39. Without evidence of a custom or policy and how that custom or policy violated a constitutional right, plaintiffs fail to create a genuine issue of material fact. *Boyd v. Benton Cnty.*, 374 F.3d 773, 784 (9th Cir. 2004) ("[Plaintiff] cannot survive summary judgment on her *Monell* claim by simply relying on the lack of a written policy.").

To the extent plaintiffs rely on the theory that the City failed to adequately investigate, and thus ratified the conduct of the individual officers creating a policy or custom of excessive force, this argument fails. *See Davage v. City of Eugene*, 2007 U.S. Dist. LEXIS 50337 at *36 (D. Or. Jul. 6, 2007) ("Plaintiffs' assertion regarding the failure to investigate alleged violations is irrelevant to the claims asserted in the complaint as plaintiffs do not allege any violations

based on activities occurring after the search or how such failure amounts to a policy that caused the alleged deprivation of rights. For example, plaintiffs do not offer evidence of prior incidents of failure to investigate Fourth Amendment violations . . .").

Plaintiffs cite to two Ninth Circuit cases to establish that a failure to investigate can ratify conduct and create a custom or policy; however, Plaintiffs misunderstand the precedent they cite as support for such a proposition. First, Plaintiffs cite to *Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir. 1995). *Fuller* involved a police officer for the City of Oakland filing a Title VII and 42 U.S.C. § 1983 action after the city failed to properly investigate her complaints and take appropriate steps to end the discrimination. *Id.* at 1525. Here, the claim brought by plaintiffs is not directed at the City's failure to investigate past complaints; rather, it is about whether at the time the incident occurred the City had a custom or policy allowing for such an incident to occur. Second, plaintiffs cite to *Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001). In *Gomez*, prison officials completely failed to investigate retaliatory acts done to prisoners exercising their constitutional rights even though the prison warden knew of such acts. *Id.* at 1123. Again, the present case is vastly different. Plaintiffs have presented no evidence that the City was aware that officers were engaging in the use of excessive force prior to the alleged excessive force incident at issue here. Moreover, the City did conduct a standard Internal Investigative Report after the incident in question and such a report does not ratify certain conduct; rather, it is a factual summary of the incident. Def.'s Rep. for Mot. Summ. J. 5, ECF No. 57.[2] Thus, plaintiffs' argument that City failed to investigate, which led to a ratification of a policy allowing for excessive force is incorrect and fails as a matter of law.

---

[2] While plaintiffs argue the report simply takes the officers' version of events, plaintiffs refused to be interviewed for that report.

Moving to the theory of liability alleging a failure to train, supervise, or discipline employees, this theory of liability fails as well because plaintiffs have failed to present any evidence creating a question of fact on this issue. When a *Monell* claim is based on a failure to adequately train employees, the government's omission must amount to a 'deliberate indifference' to a constitutional right. *Clouthier v. Cnty of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). To show 'deliberate indifference' a plaintiff must show that there is a direct link between the policy and the alleged constitutional violations. *Mackinney v. Nelson*, 69 F.3d 1002, 1010 (9th Cir. 1995) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). In order to show this link a plaintiff can prove the policy itself is unconstitutional or that the city made a 'deliberate' choice to fail to train its employees adequately. *Id.* A showing that the city made a 'deliberate' choice to fail to train its employees adequately can be met by showing that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

Plaintiffs have not presented any evidence that indicates the City was deliberately indifferent in training, supervising, or disciplining its officers. Plaintiffs recite the following arguments in their response to support the theory that the City failed to train its officers:

> 5. Stropko testified he was under no obligation to deescalate the situation because he was only a back-up officer. . . .
>
> 7. Both Sites and Stropko testified that Hart and Solesebee arrived on the deck, running, moving quickly, without pause, hesitation or lull. Both Hart and Solesbee testified they were supposed to stop and assess the situation when called to a Code 3.
>
> 8. Neither Hart nor Solesbee exhibited any de-escalation techniques before combating with Quinton and Ms. Elliot.

Pl.'s Resp. 11-12.

Even assuming the allegations above are in the record and accurate,[3] they are insufficient to prove that the City was deliberately indifferent in training, supervising, and disciplining officers and that deliberate indifference led to the incident at issue. *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007) ("absent evidence of a 'program-wide inadequacy in training,' any shortfall in a single officer's training 'can only be classified as negligence on the part of the municipal defendant—a much lower standard of fault than deliberate indifference.'"). Plaintiffs have not presented evidence to indicate that the incident at issue was the result of a program-wide inadequacy in training. The City has submitted evidence that the City does in fact train officers in the appropriate use of force and trains officers on how to properly respond to individuals in a mental health crisis. The City has a policy of reviewing complaints through an internal affairs process and metes out appropriate discipline when the conduct violates the City's policies. Kerns Decl. 2, ECF No. 39. Plaintiffs fail to create an issue of fact as to their deliberate indifference theory.

**2. Unlawful Arrest Claim**

Plaintiffs bring an unlawful arrest claim against Officer Stropko and Officer Solesbee for the arrest of Ms. Elliot. To support this false arrest claim, plaintiffs contend that the officers' order to Ms. Elliot that she remove herself from her son was not 'lawful'; thus, the arrest for interfering with a peace officer was not supported by probable cause.

An officer can make a "warrantless arrest . . . where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has

---

[3] At least on these relevant pages, plaintiffs did not provide citations to the record supporting these claims.

committed, is committing, or is about to commit an offense." *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990) (quoting *Michigan v. DeFillipo*, 443 U.S. 31, 37 ( 1979).

Ms. Elliot was arrested on her porch for interfering with a peace officer under ORS 162.247. ORS 162.247 provides that:

> (1) A person commits the crime of interfering with a peace officer or parole and probation officer if the person, knowing that another person is a peace officer or a parole and probation officer as defined in ORS 181.610:
>
> (a) Intentionally acts in a manner that prevents, or attempts to prevent, a peace officer or parole and probation officer from performing the lawful duties of the officer with regards to another person; or
>
> (b) Refuses to obey a lawful order by the peace officer or parole and probation officer.

The officers had probable cause to arrest Ms. Elliott for violating ORS 162.247. Ms. Elliott knew that the officers were Eugene Police Officers. Elliott Dep. 94-95. The officers ordered Ms. Elliott to remove herself from her son several times as is indicated by the recording. Miller Decl. Ex. 4 at 15-24. Ms. Elliott admits she did not comply with those instructions. Elliott Dep. 108.

Plaintiffs' posit that the arrest was in violation of the Fourth Amendment because "to order a mother to stop protecting her mentally disabled handcuffed son from being tased unnecessarily" is not a lawful order. Pl.'s Resp. 17. While I am sympathetic towards what Ms. Elliot was allegedly trying to do, her purpose and state of mind for disobeying the order of an officer—just like the officer's own subjective state of mind for giving the order—is irrelevant to whether that order is lawful and whether a subsequent arrest is supported by probable cause. *See generally John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2007) (explaining that the state of mind of an officer is irrelevant in a probable cause inquiry because it is an objective analysis

9—OPINION AND ORDER

under § 1983 that only requires the inquiry of whether a prudent person in the place of the arresting officers would believe there was a fair probability that an offense was committed).

An order is lawful if it is made in order to control a potentially dangerous situation and the failure to obey the officers' order could create a further risk of harm. *State v. Neill*, 216 Or. App. 499, 508 (2007). Based on the evidence in the record, the order was made directly for that purpose. Sites Dep. 61-64. The officers were responding to a potential assault and a man in a possible mental health crisis. Sites Dep. 29-32. While the officers were on the porch assessing the situation, Mr. Richardson-Brown became agitated and began to curse profanities at the officers. Miller Decl. Ex. 4. Based on the behavior of Mr. Richardson-Brown at the scene, and the reason for the officers to be dispatched to the Plaintiff's home, the order for Ms. Elliott to stay back was made for her safety and the safety of the officers. A prudent person in the officer's position could believe Ms. Elliott had committed a crime under ORS 162.247.

### 3. Unreasonable Search and Seizure Claim

Plaintiffs contend that Officer Sites and Officer Stropko violated the Fourth Amendment by remaining "unlawfully on plaintiffs property when there was no crime or reason, remaining only to provoke plaintiffs into an incident, which brought violence upon them. There was simply no reason for these officers to have remained after seeing that there was no person in danger." Pl.'s Compl. at 13. In support of this claim, the Plaintiffs' cite to Ms. Elliott's statement telling the officers "[i]f you have a gun or a taser, get off of my property." Elliott Dep. 107.

The Fourth Amendment "provides in pertinent part that the 'right of the people to be secure in their houses . . . against unreasonable searches and seizures shall not be violated . . .'" *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61 (1992) (quoting *Ker v. California*, 374 U.S. 23, 30 (1963)). A search is generally unreasonable if it is conducted without a warrant, absent an

exception to the warrant requirement. *Payton v. New York*, 445 U.S. 573, 586 (1980). There are two exceptions to the warrant requirement that are applicable to the present case. The first being the premise that, "[i]t is well established that consent is a recognized exception to the Fourth Amendment's protection against unreasonable searches and seizures." *United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012). Second, the Fourth Amendment contains an exception for emergencies. "The "emergency" exception stems from the police officers' "community caretaking function" and allows them "to respond to emergency situations" that threaten life or limb[.]" *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir. 2000) (abrogated on other grounds by *Brigham City, Ut. v. Stuart*, 547 U.S. 398 (2006)). In assessing whether either of the above exceptions apply, the inquiry "turns on the reasonableness of the officer's actions in light of the totality of the circumstances." *Id.*

Here, Officer Sites and Officer Stropko were dispatched to investigate a potential assault. Stropko Decl. 20. Once they arrived, they walked directly to the front door and knocked. Sites Decl. 5. It cannot be disputed that at this point Officer Stropko and Officer Sites were not in violation of the Fourth Amendment. *See Florida v. Jardines*, 133 S. Ct. 1409, 1416 (2013) (stating that an officer does not need a warrant to approach the curtilage of the home and knock on the door). Ms. Elliot immediately answered the door and conversed with the officers about her son and his situation. Elliott Dep. 94. Considering that Ms. Elliott herself called 911 earlier in the evening, it is reasonable that the officers believed Ms. Elliott consented to their presence up to this point. Ms. Elliott only revoked her consent after Mr. Richardson-Brown became agitated, began cursing at the officers, and was threatened with being tased. Officer Sites. Pl.'s Resp. at 19; Miller Decl. 5-20. It is important to remember that Officer Stropko and Officer Sites were at the residence of Ms. Elliott because of a suspected assault by a man in a mental health crisis.

Sites Dep. 59-64. Ms. Elliott's ex-husband told the dispatcher he was quite concerned for Ms. Elliott's safety. This was the knowledge of the officers heading into the incident, and once present they observed that Mr. Richardson-Brown exhibited signs of a mental health break (by cursing at the Officers, telling them they were not officers, and telling them to tase him). Miller Decl. 5-16. Based on these circumstances, it was reasonable for Officer Sites and Officer Stropko to remain on the curtilage of Ms. Elliott's home under the 'emergency exception' to the Fourth Amendment to serve the community caretaking purpose of protecting others from potential harm.

Even if this Court assumes that Officer Sites and Officer Stropko were in violation of the Fourth Amendment by staying on the curtilage of Ms. Elliott's home after she ordered them to leave, each officer is protected by qualified immunity. An officer is entitled to qualified immunity unless the constitutional right violated "was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). The law does not clearly establish that Officer Sites and Officer Stropko's conduct was unlawful or that a reasonable officer in the circumstances would understand it to be unlawful. This was a dynamic and uncertain situation and the officers' decision to stay on the property would seem reasonable in light of the totality of the circumstances that they were facing. Indeed, one wonders what liability they would face if they simply heeded Ms. Elliott and left the property, only to have some harm actually occur to her. It is these very difficult, on-the-scene decisions that have to be made by law enforcement that are the focus of protection under qualified immunity.

### 4. Equal Protection Claim

Plaintiffs' contend that Officer Stropko used force against each plaintiff based upon their race. Pl's. Compl. 52-59. In order to state a § 1983 claim for violation of the Equal Protection Clause, "a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (citing *Washington v. Davis*, 426 U.S. 229, 239-240 (1976).

Plaintiffs have not presented any evidence to make a showing that Officer Stropko intentionally used force because plaintiffs are black. In the Complaint, Plaintiffs state that Officer Stropko identified Mr. Richardson-Brown as 'huge.' Pl.'s Compl. 53. From this, plaintiffs state that the logical inference for why force was used is because "white police know large black men are more threatening and dangerous than their white counterparts." Pl.'s Compl 53. In her deposition, Ms. Elliott stated she did not know if Officer Stropko acted with discriminatory intent and that he only described Mr. Richardson-Brown as "6'1" tall, weighed 225 pounds, and a very athletic, muscular build." Elliott Dep. 147, 149. There is no evidence any officer mentioned anything even tangentially related to race during this encounter. There is no evidence any officer every treated a person of a different race a different way in a similar situation. The only evidence presented by plaintiffs is that Officer Stropko is a different race than Mr. Richardson-Brown. This is insufficient to defeat a motion for summary judgment on an equal protection claim based on race. *See Bingham v. City of Manhattan*, 341 F.3d 939, 948 (9th Cir. 2003) (explaining that the mere fact that a plaintiff is a different race than an officer does not raise an inference of an equal protection violation).[4]

---

[4] Plaintiffs make much out of Officer Stropko's testimony that if he arrived at a call involving a fellow officer, who happened to be taller than Mr. Brown-Richardson, he would not be frightened. Apparently, because Mr. Richardson-Brown is smaller than the officer, and Officer Stropko was frightened of Mr. Brown-Richardson, Officer Stropko must be a racist. To say Plaintiffs' argument here stretches the evidence is an understatement.

13—OPINION AND ORDER

### 5. Negligence Claim

Plaintiffs' final claim, against the City, alleges:

> Defendant City is vicariously and directly liable to plaintiff for the individual defendants' negligence and for negligently hiring, training, supervising, and/or disciplining defendants.

Pl.'s Compl 62.

Defendants move for summary judgment only on the latter portion of that claim. To prove a negligent hiring, supervision, or discipline claim, plaintiffs must show the City knew or reasonably should have known that the individual officers needed better training, supervision, or discipline and the City's failure to address such negligence was a contributing factor in causing the injuries to plaintiffs. *See Whelan v. Albertson's, Inc.*, 129 Or. App. 501, 507 (1994).

Here, Plaintiffs have presented no evidence establishing that the City should have known of the individual officers' propensity to use the alleged force or that the City's alleged failure to train, supervise, or discipline was a contributing factor to the plaintiff's injuries. In fact, the evidence indicates that plaintiffs are unaware of how each individual defendant was hired, supervised, or disciplined. Elliot Dep. 155-157. Since plaintiffs have presented no evidence to establish negligence in hiring, supervision, or discipline, there is no genuine dispute of material fact as to this claim.

/ / / /

/ / / /

/ / / /

---

In reading Officer Stropko's answer to a clumsily-presented question, he clearly was confused about counsel's question asking if he would be afraid of arriving at a call to the home of a person he knows well and is not afraid of. Stropko Depo., 35-37. Of course Officer Stropko would not be afraid of seeing an acquaintance, no matter how large, walk out of a doorway. On the other hand, Officer Stropko did not know Mr. Brown-Richardson and Mr. Brown-Richardson became agitated, if not aggressive, during a psychotic break. There is no evidence in this record of any race-based animus.

## CONCLUSION

Defendants' motion for partial summary judgment is GRANTED in part. The remaining claims are the excessive force, battery, and negligence claims.

IT IS SO ORDERED.

DATED this 17th day of May, 2017.

                                                             /s/ Michael McShane
                                                                Michael McShane
                                                         United State District Judge